STROUD, Judge.
 

 *577
 
 Plaintiff Amy S. Grissom ("Mother") appeals from the trial court's order holding that defendant David I. Cohen ("Father") is not in civil contempt of a prior custody order based upon the refusal of the parties' daughter, Mary,
 
 [1]
 
 to return to the physical custody of Mother. The trial court first entered an order denying Mother's motion for contempt on 17 August 2016, but this order did not include findings of fact necessary to permit review by this Court, so we vacated that order and remanded
 
 *578
 
 for the trial court to enter a new order including findings of fact to support its conclusion. We affirm.
 

 I. Background
 

 This appeal arises from an exceptionally contentious and prolonged custody battle between Mother and Father, beginning in January 2007 and continuing, with a few lulls, ever since. The parties are the parents of two children; the oldest, their son John, had just turned 18 before Mother filed her contempt motion, and the contempt motion and order
 
 *456
 
 in this appeal applies only to their daughter, Mary, now age 17. We will not recount the details of this battle leading up to the order on appeal, but in brief summary, the first custody order entered in 2009 granted sole legal and primary physical custody to Mother and secondary custodial time to Father.
 
 [2]
 
 Father's decision-making authority regarding the children was severely curtailed by this order based upon Father's misdeeds as described in the order. There were some relatively minor legal skirmishes after the 2009 order, with no major changes to the custodial arrangement until 9 March 2015, when the trial court entered an order modifying the 2009 custody order ("2015 Modified Custody Order"). Generally, the 2015 Modified Custody Order found that Father's behavior and relationship with the children had improved and the children wanted to spend more time with him. The 2015 Modified Custody Order allowed Father to have greater visitation time with the two children.
 

 On 10 June 2016, Mother filed a motion she calls an "Omnibus Motion," comprising a motion for civil and criminal contempt, a motion for a temporary restraining order ("TRO") and preliminary injunction, and a motion for "judicial assistance." The Omnibus Motion is single-spaced and 17 pages long. Five and a half pages summarize the procedural history, including quotes from portions of prior orders, with particular emphasis on any findings unflattering to Father. The substantive portion of the Omnibus Motion begins at the bottom of page 5 and is entitled "Withholding of Plaintiff/Mother's Physical Custodial Time and Alienation." Mother then makes four pages of allegations, some "upon information and belief," of Father's actions and statements she alleges are part of his "campaign to alienate the children from Plaintiff/Mother," which has "intensified after the Court's most recent Custody Order and
 
 *579
 
 has resulted in the children being severely alienated from Plaintiff/Mother."
 
 [3]
 
 She stresses her belief that Father has encouraged the children not to return to her and that he has not "caused the children to face any consequences for their failure" to return to her home. She alleged that in January 2016, she received an email from John, which was copied to Father; Dr. Shulstad, the children's pediatrician; Samantha Bosco, the guidance counselor at Mary's high school, and Janani Buford, the guidance counselor at Mary's middle school. John said Mary had confided to him a few days before that she was self-harming by cutting herself, and she had been doing this for about a year. He believed that she "needed serious help" and needed "to be in as positive of an environment as possible." John also stated:
 

 After almost ten years of moving back and forth constantly, and my 18th birthday coming quickly, I feel that I am mature and reasonable enough to make my own decisions. I have spoken with [Mary] and I feel that it is best if we spent time solely with Dad. [Mary] and I both love you very much. I would still like to see you and sustain a good relationship with you, but this current situation is just too difficult for me and [Mary] to cope with. I hope that you will understand and respect our decision just as we have understood and respected yours for almost a decade.
 

 John claimed Mary asked Mother if she could see a therapist but her Mother ignored her; Mother denied that Mary ever requested to see a therapist. At the time of this email, the children had been with Father since 28 December 2015 for holiday visitation and they did not return to Mother's home afterwards except for some brief visits; they did not stay overnight. Mother alleged this email was another example of Father's campaign
 
 *457
 
 to destroy her relationship with the children. She alleged that Father was encouraging the children not to return to Mother's home and that he gave them no consequences for their refusal. She alleged that despite the children's refusal to return to her home, he "rewards" Mary by continuing to allow her to have sleepovers with friends, buy clothing, keep her phone, and take vacations. She alleged that the children were "hostile" and "cruel" to her, just as Father has been.
 
 *580
 
 The next section of the motion is entitled "Refusal to Support [Mary's] Attendance in Therapy, Failure to Apprise Plaintiff/Mother of [Mary's] Condition, And Attempt to Obtain [Mary's] Therapeutic Records." Mother describes her efforts to find a therapist for Mary after receiving the email from John and Mary's opposition to seeing the therapist she selected, alleging that Mary's reluctance was caused by Father's "influencing [Mary] to further his own goals." Mary did ultimately see the therapist Mother selected, Ms. Reed, although she "continues to be reluctant." She alleged that on 2 February 2016, Mary "refused to leave school to attend an appointment with Ms. Reed," and Mother took her to see Dr. Shulstad, who discovered eight or nine "fresh cuts on [Mary's] leg." She notes this cutting occurred while Mary was with Father. Dr. Shulstad encouraged Mary to see Ms. Reed, and although she refused at times, she attended some appointments "when forced to do so by Dr. Shulstad or when she wants something (such as medical authorization to attend a summer camp)."
 

 The next section of the motion is entitled "Interfering with Educational Decisions" and includes about a page of allegations of the parties' disputes regarding Father taking Mary to tour boarding schools during the previous summer. The following section is entitled "Motion for Contempt." It has five paragraphs, alleging his willful violation of the order and requesting that Father be held in civil and criminal contempt.
 

 The next section of the motion is entitled, "Motion for Temporary Restraining Order and Preliminary Injunction." Mother requested that the court enter a Temporary Restraining Order and Preliminary Injunction enjoining Father "from interfering with" Mother's custodial rights and "authority to made medical and mental health decisions" for Mary; from taking Mary to "tour any additional schools" or talking to her or assisting her in any way regarding her application or attendance at any school; and from showing "these Motions and any subsequent Orders to the parties' children" or talking about them. She also asked that Father be required to "return [Mary] to" her physical custody and "to support [Mary's] attendance at reunification therapy and counseling with the therapist" of Mother's choice.
 

 The last section of the motion is entitled "Motion for Judicial Assistance" and Mother moved for the court to "facilitate intensive reunification therapy."
 

 The prayer for relief is two pages long. In pertinent part, Mother requested issuance of a show cause order directing that a hearing be held and that Father "show cause as to why he should not be held in
 
 *581
 
 contempt of the March 2015 Custody Order." She also requested that the court
 

 3. Find Defendant/Father in civil contempt of court and punish him as set forth in N.C.G.S. § 5A-21 et seq. until he can demonstrate a willingness to comply with the Court's March 2015 Custody Order.
 

 4. Find Defendant/Father in criminal contempt of court and punish him as set forth in N.C.G.S. § 5A-12 as a result of his willful failure to comply with the provisions of the March 2015 Custody Order.
 

 Mother specifically asked for a list of "mechanisms" to enforce the Order and "as purging conditions" of contempt. This list includes several continuing actions, including that he "exert his parental authority and control": to ensure that [Mary] returns to" her custody and stays there; to ensure that Mary attends counseling, to ensure that Mary attends reunification therapy; and to ensure that Mary communicates with Mother while in Father's care. Mother also asked that Father be required to permit Mother to "make up the custodial parenting time missed since January 4, 2016."
 

 On 13 June 2016, Mother filed and served Father with a Notice of Hearing for 28 June
 
 *458
 
 2016 on "Plaintiff/Mother's Motion for Contempt filed June 10, 2016." On 14 June 2016, the trial court entered an Order to Show Cause requiring Father to appear and show cause why he should not be held in civil or criminal contempt. Father requested continuance of the hearing to allow more time to prepare, but his motion was denied, and the trial court held a hearing on the contempt motion and order to show cause on 28 June 2016.
 

 As this Court noted in the prior appeal, "At the 28 June 2016 show cause hearing, the trial court did not allow Mother to proceed on
 
 both
 
 civil
 
 and
 
 criminal contempt, requiring Mother to choose to pursue either civil
 
 or
 
 criminal contempt. Accordingly, Mother chose to proceed on her civil contempt motion against Father."
 
 Grissom v. Cohen
 
 , --- N.C. App. ----,
 
 803 S.E.2d 697
 
 , at *2 (2017) (unpublished) (" Grissom I"). The trial court entered its first order finding Father not to be in civil contempt which was reversed by the first appeal and remanded for findings of fact:
 

 The trial court's order, though, is devoid of any specific factual findings regarding Father's actions concerning the issue of Father's willfulness. In order for us to conduct any meaningful review of the trial court's determination
 
 *582
 
 regarding Father's willfulness, we must know what facts the trial court found to make that ultimate finding. Therefore, we remand the matter and direct the trial court to enter specific factual findings regarding whether Father's actions were willful. For instance, if the trial court enters findings that Father did not force or encourage his children to stay with him during Mother's time with the children, such findings would support the trial court's ultimate finding that Father did not act willfully, and the trial court would not be required to hear any additional evidence on the matter.
 

 Grissom I
 
 , --- N.C. App. ----,
 
 803 S.E.2d 697
 
 , at *5 (citation omitted).
 

 On 9 October 2017, the trial court entered a new order ("Order on Remand") with detailed findings of fact and conclusions of law
 
 [4]
 
 without receiving additional evidence. Mother timely appealed.
 

 II. Analysis
 

 Mother argues the trial court "erred by failing to hold Father in civil contempt for effectively eliminating Mother's primary custody of their daughter." She claims to challenge 22 of the 37 findings of fact in the order and 7 of the legal conclusions. Although she argues she is challenging the findings of fact, she does not argue that the findings are not supported by the evidence. Instead, she contends the trial court's findings are in error because it (1) "misallocated the burden of proof;" (2) "Misapprehended the express and implied requirements of the Modified Custody Order," specifically arguing that the order is a "forced visitation order;" and (3) erred by determining that "Father committed no
 
 willful
 
 violation of the modified custody order" based upon the trial court's misunderstanding of "willfulness" in this context. She makes the bold and legally impossible request that
 
 this
 
 Court make the factual determination that "Father willfully violated the Modified Custody Order" and to "remand ... for a new fact-finder to consider additional evidence regarding whether Father remains in civil contempt." We cannot do this, since it is the trial court, not our Court, which is "entrusted with the duty to hear testimony, weigh and resolve any conflicts in the evidence, [and] find the facts[.]"
 
 State v. Cooke
 
 ,
 
 306 N.C. 132
 
 , 134,
 
 291 S.E.2d 618
 
 , 620 (1982). Mother requests in the alternative that we "remand for a new fact-finder to conduct a new contempt hearing with detailed instructions
 
 *583
 
 indicating that [
 
 Hancock v. Hancock
 
 ,
 
 122 N.C. App. 518
 
 ,
 
 471 S.E.2d 415
 
 (1996) ] and its progeny do not control."
 
 [5]
 

 This Court does not conduct wholesale
 
 de novo
 
 review of contempt orders, as Mother seems to request. Instead, "[t]he
 
 *459
 
 standard of review for contempt proceedings is limited to determining whether there is competent evidence to support the findings of fact and whether the findings support the conclusions of law."
 
 Sharpe v. Nobles
 
 ,
 
 127 N.C. App. 705
 
 , 709,
 
 493 S.E.2d 288
 
 , 291 (1997). "However, findings of fact to which no error is assigned are presumed to be supported by competent evidence and are binding on appeal. The trial court's conclusions of law drawn from the findings of fact are reviewable
 
 de novo
 
 ."
 
 Tucker v. Tucker
 
 ,
 
 197 N.C. App. 592
 
 , 594,
 
 679 S.E.2d 141
 
 , 142-43 (2009) (citations, quotation marks, and brackets omitted). Since Mother has challenged none of the findings of fact as unsupported by the evidence, but argues only that the trial court "misapprehended" the law, we will review
 
 de novo
 
 the trial court's "apprehension of the law" to determine if the trial court considered the issues under the correct legal standards.
 
 See generally
 
 id.
 

 If the trial court considered the issues based upon the correct law, we will review the legal conclusions to determine if they are supported by the findings of fact.
 

 Id.
 

 The trial court may find a party in civil contempt for failure to follow a court order under N.C. Gen. Stat. § 5A-21, which provides:
 

 (a) Failure to comply with an order of a court is a continuing civil contempt as long as:
 

 (1) The order remains in force;
 

 (2) The purpose of the order may still be served by compliance with the order;
 

 (2a) The noncompliance by the person to whom the order is directed is willful; and
 

 (3) The person to whom the order is directed is able to comply with the order or is able to take reasonable measures that would enable the person to comply with the order.
 

 N.C. Gen. Stat. § 5A-21(a) (2017).
 

 *584
 
 A. Burden of Proof
 

 Mother first argues the trial court improperly placed the burden of proof of civil contempt on her and not on Father. She notes correctly that "A show cause order in a
 
 civil
 
 contempt proceeding which is based on a sworn affidavit and a finding of probable cause by a judicial official
 
 shifts the burden of proof
 
 to the defendant to show why he should not be held in contempt."
 
 State v. Coleman
 
 ,
 
 188 N.C. App. 144
 
 , 149-50,
 
 655 S.E.2d 450
 
 , 453 (2008). The trial court entered the 14 June 2016 Show Cause Order based on Mother's Omnibus Motion, so Father had the burden to show why he should not be held in contempt under the show cause order.
 
 Id
 
 . But Mother had also filed and served a separate notice of hearing on 13 June 2016 on the motion for contempt; on that motion and notice of hearing, the burden of proof was on her.
 
 See
 
 N.C. Gen. Stat. § 5A-23(a1) ("The burden of proof in a hearing pursuant to this subsection shall be on the aggrieved party.").
 

 Mother argues that the trial court improperly placed the burden on her based upon the following conclusion of law in Order on Remand: "5. As a matter of law, Mother failed to prove by a preponderance of the evidence that Father was in violation of the Modified Custody Order; nor has Mother met
 
 her burden
 
 of proving that Father is in civil contempt." (Emphasis added). The Order on Remand also included several other conclusions of law that Father was not in willful contempt. Three were included in the section of the order entitled "Conclusions of Law:"
 

 3. As a matter of law, Father has not willfully violated the Order with his actions such that he is in civil contempt, as alleged by Mother.
 

 ...
 

 7. Father is not in civil contempt of Court.
 

 8. Mother's motion for Contempt should be denied.
 

 At least two others were included within the Findings of Fact:
 

 35. Father is not in civil contempt.
 

 36. Mother's motion for civil contempt should be denied.
 

 Mother also argues that it would be "problematic to simply reverse based on the burden-misallocation and remand for an unguided reconsideration," because of Mary's "fast-approaching eighteenth birthday." She therefore requests
 
 this Court
 
 to make new factual determinations based upon the allegations in
 
 *460
 
 her verified motion-which we cannot do, and would not do if we could-or that we remand for a complete do-over
 
 *585
 
 with a different judge. Even if there was any legal basis for a complete do-over-and there is not-remand for an entirely new trial would be unlikely to accomplish Mother's purpose of having a new order before Mary turns 18. We appreciate her urgency to have the assistance of the courts in reestablishing her relationship with Mary, but we must review the order on appeal in compliance with the correct standards of review.
 
 [6]
 

 See generally
 

 Sharpe
 
 ,
 
 127 N.C. App. at 709
 
 ,
 
 493 S.E.2d at
 
 291 ;
 
 Tucker
 
 ,
 
 197 N.C. App. at 594
 
 ,
 
 679 S.E.2d at 142-43
 
 (2009).
 

 We agree the trial court's various conclusions of law are confusing, and the trial court probably should not have used the words "her burden" in the order. Taken out of context, these words create Mother's argument that the trial court "misapprehended" the law and placed the burden on her.
 
 See
 

 Tigani v. Tigani
 
 , --- N.C. App. ----, ----,
 
 805 S.E.2d 546
 
 , 549-50 (2017) (" N.C. Gen. Stat. § 5A-23(a) (2015) provides that a proceeding for civil contempt may be initiated by the order of a judicial official directing the alleged contemnor to appear and show cause why he should not be held in civil contempt, or by the notice of a judicial official that the alleged contemnor will be held in contempt unless he appears and shows cause why he should not be held in contempt. Under either of these circumstances, the alleged contemnor has the burden of proof. In addition, pursuant to N.C. Gen. Stat. § 5A-23(a1), proceedings for civil contempt may be initiated by motion of an aggrieved party giving notice to the alleged contemnor to appear before the court for a hearing on whether the alleged contemnor should be held in civil contempt. The burden of proof in a hearing pursuant to this subsection shall be on the aggrieved party. When an aggrieved party rather than a judicial official initiates a proceeding for civil contempt, the burden of proof is on the aggrieved party, N.C. Gen. Stat. § 5A-23(a1) (2015), because there has not been a judicial finding of probable cause." (Citations, quotation marks, brackets, and ellipses omitted) ).
 

 Father argues that the trial court's confusing order is the result of Mother's complex motions. In her Omnibus Motion she asked to proceed on
 
 both
 
 civil and criminal contempt simultaneously, and to proceed on
 
 both
 
 the motion for contempt (for which she would have the burden of proof) and the show cause order for contempt (for which Father would have the burden of proof). He contends that since this Court had already
 
 *586
 
 remanded for a detailed order, the trial court was simply trying to cover all the bases. Father may be right that the trial court was simply trying to address both the contempt motion and the Show Cause Order with its multiple conclusions of law that Father was not in willful contempt.
 
 [7]
 
 But upon reviewing the various motions, hearing transcript, this Court's prior opinion, and the entire order in context, we simply cannot agree that the trial court misallocated the burden of proof.
 

 At the beginning of the hearing, the trial court and counsel discussed which portions of the Omnibus Motion were to be heard that day. Before any evidence was presented, the trial court asked Mother's counsel:
 

 Judge: Well, you get to choose whether you want to proceed first or whether you want the burden to shift, right, on the motion to show cause?
 

 [Mother's counsel]: I do want the burden to shift. My sole question is about time and some equal allocation of the time.
 

 The trial court then asked counsel how many witnesses each anticipated calling to assist in allocation of the time for the hearing. Father's counsel said he would call four or five witnesses; Mother's counsel said she
 
 *461
 
 would call "zero to one" but noted that he would need adequate time for cross-examination and argument. The trial court then allocated time for the case, and Father presented his evidence
 
 first,
 
 because he had the burden of proof. During the testimony of the witnesses, there were many objections from counsel and the trial court tried to keep the questioning focused on the issue being heard since the issue was civil contempt, not criminal. At one point during cross-examination of Father by Mother's counsel, regarding the dispute over Father's taking Mary to visit boarding schools in 2015, the trial court noted this would be a past violation and not something for which Father may be held in civil contempt for as of that hearing in 2016. The trial court noted:
 

 JUDGE OSMAN: I mean, as it relates to-well, I mean, I don't know. I just did a CLE on this, I planned a CLE on this. I kind of feel like I know what I'm talking about. But sure, go ahead.
 

 *587
 
 At these points and others during the hearing, the trial court demonstrated that it understood the differences between civil and criminal contempt and understood the differences in the burden of proof between a motion for contempt and a show cause order. We are satisfied that the trial court understood that the burden of proof was on Father to show cause on why he should not be held in contempt and that the reference in the order to "her burden" was in response to Mother's motion for contempt, as opposed to the show cause order.
 

 Even if we remanded for the trial court to rephrase its order and remove the words at issue, ultimately, nothing would change. Father met his burden to show cause as to why he should not be held in contempt. He testified, and he presented compelling evidence including testimony from John, Mary, Dr. Shulstad, Ms. Buford, and various documentary exhibits. A remand would simply delay final resolution of the contempt motion and prolong litigation in this matter until after Mary turns 18.
 

 Mother did not testify or present any testimony from any other witnesses, electing to rest on her verified motion alone.
 
 [8]
 
 Over Father's objection, the trial court agreed to accept her verified motion as equivalent to testimony presented at trial. We express no opinion on whether the trial court should have accepted the motion in this manner, but the mere fact that she filed a verified motion does not make her allegations irrefutable, any more than her live testimony would be irrefutable. The trial court has the discretion to determine the credibility and weight of all the evidence, whether it was a written document or live testimony, and this Court cannot re-weigh the evidence.
 
 See, e.g.,
 

 Clark v. Dyer
 
 ,
 
 236 N.C. App. 9
 
 , 27-28,
 
 762 S.E.2d 838
 
 , 848 (2014) ("[I]t is within a trial court's discretion to determine the weight and credibility that should be given to all evidence that is presented during the trial. We will not reweigh the evidence presented to the trial court[.]" (Citation and quotation marks omitted) ). Father refuted the motion, and Mother had full opportunity to
 
 respond
 
 to his presentation of evidence, but chose not to do so and to rely only on her written motion. In other words, Father met
 
 his burden
 
 to produce evidence in response to the Show Cause Order to show why he should not be held in willful contempt with competent evidence which the trial court determined was credible. The burden then shifted back to Mother to refute his evidence, but she elected not to present any evidence. In that sense, she did not carry "her burden,"
 

 *588
 
 either to show contempt under her motion for contempt or to respond to Father's evidence presented based upon the show cause order.
 

 Mother also argues that the trial court's "misapprehension" of the burden of proof caused the findings of fact to be improper, since the court was considering the evidence under the wrong law. Even if the trial court had "misapprehended" the burden of proof, Mother has not explained how this "misapprehension" would have had any effect on the findings of fact. The findings are all supported
 
 *462
 
 by the evidence and most of the facts are not really in dispute. For example, Mother challenges this finding of fact:
 

 16. [Mary] revealed to her brother that she had been self-harming for approximately one year and that she felt depressed and particularly so when at her Mother's home.
 

 But Mother's own Omnibus Motion included detailed allegations of these same facts about Mary's revelation to John. There was no real dispute regarding most of the basic facts relevant to contempt, such as when Mary stopped going to her Mother's house, her stated reasons for stopping, or that she was depressed and self-harming. Mother's motion is based only on
 
 why
 
 Mary remained at her Father's home. She claims Mary stayed because of Father's continuing intense efforts to alienate Mary and his refusal to force her to return to Mother's home; Father claims Mary refused to go and he tried but was unable to make her go by any reasonable means short of physical force or punishment that may exacerbate her depression and self-harming. The trial court's findings resolved these factual issues, and based upon the evidence, we cannot discern how a "misapprehension" of the burden of proof would have made any meaningful difference in the findings of fact. This argument is without merit.
 

 B. "Implied" Forced visitation provisions
 

 Mother next argues that the trial court "misapprehended the express and implied requirements of the modified custody order." She notes that the Order on Remand states that the 2015 Modified Custody Order has no "directive" requiring either party to "force visitation with the other parent." She challenges these findings of fact, which she notes are actually mixed findings of fact and conclusions of law:
 

 26. It is very clear that both children do not want to see their Mother, and there is no directive in the Order imposing any duty on either parent to force visitation with the other parent.
 

 *589
 
 ....
 

 33. Father is not in willful violation of the Modified Custody Order, and any noncompliance by Father, the person to whom the order is directed, is not willful. To the extent the visitation schedule is not being honored, the Court finds that this is the consequence of [Mary's] refusal to return and not due to any ongoing conduct by Father to thwart, prevent or inhibit [Mary's] return to Mother's residence.
 
 [9]
 

 Mother contends that the 2015 Modified Custody Order does have "implied" forced visitation requirements. The 2015 Modified Custody Order is long and very detailed, but in summary, the order sets out detailed provisions on custodial times for each parent including holidays and school breaks and detailed provisions on decision-making. It also includes the provision that "[t]his order is enforceable by the contempt powers of the Court."
 

 Mother relies heavily on
 
 Reynolds v. Reynolds
 
 ,
 
 109 N.C. App. 110
 
 ,
 
 426 S.E.2d 102
 
 (1993), for her argument that the 2015 Modified Custody Order is a "forced visitation" order.
 
 See
 

 id.
 

 at 113
 
 ,
 
 426 S.E.2d at 104
 
 . Yet
 
 Reynolds
 
 was not a contempt case; it was a constitutional challenge to a visitation order.
 

 Id.
 

 at 112
 
 ,
 
 426 S.E.2d at 104
 
 . In
 
 Reynolds
 
 , the mother and father originally had an order of joint custody without a specified visitation schedule.
 

 Id.
 

 at 111
 
 ,
 
 426 S.E.2d at 103
 
 . The parties could not agree on visitation, so the father filed a motion for visitation.
 

 Id.
 

 The daughter, then age 11, "expressed a desire not to visit her father[,]" but the trial court determined it was in her best interest to visit with him and entered an order setting a visitation schedule.
 

 Id.
 

 at 113
 
 ,
 
 426 S.E.2d at 104
 
 . There is no indication in the opinion that the daughter had any serious emotional or behavioral problems-such as self-harming-but she simply did not want to visit her father.
 
 See generally
 
 id.
 

 The order in
 
 Reynolds
 
 included a provision "that '[v]iolation of this Order shall be punishable by Contempt.' "
 

 Id.
 

 ,
 
 426 S.E.2d at 105
 
 . Both the mother and the daughter challenged the order as a violation of their constitutional due
 
 *463
 
 process rights.
 
 See generally
 

 id.
 

 at 112
 
 ,
 
 426 S.E.2d at 104
 
 ("The plaintiffs' sole contention on appeal is that the Order for visitation violates
 
 *590
 
 the Constitutional rights of the minor plaintiff."). This Court found "no merit to the arguments presented in the plaintiffs' brief" and affirmed the order.
 

 Id.
 

 Mother's argument regarding "forced visitation" based on
 
 Reynolds
 
 relies upon this Court's comparison of the
 
 Reynolds
 
 order to an order in
 
 Mintz v. Mintz
 
 ,
 
 64 N.C. App. 338
 
 ,
 
 307 S.E.2d 391
 
 (1983).
 
 See
 

 Reynolds
 
 ,
 
 109 N.C. App. at 112-13
 
 ,
 
 426 S.E.2d at 104
 
 . As explained in
 
 Reynolds
 
 , the
 
 Mintz
 
 order
 

 set out a specific visitation schedule which the minor son of the parties simply decided he did not want to follow. The plaintiff mother, who had primary custody of the child, did not insist that the child comply with the Order.
 
 Unlike the Order in the present case, the Order in Mintz provided that, upon noncompliance with the Order, the father was to take the Order to the sheriff's office and the sheriff was to immediately arrest the mother for contempt and place the son in the custody of the father.
 
 This Court found that such a provision denied the mother due process of law, and therefore held the visitation Order to be invalid. This Court further concluded that, although the facts in
 
 Mintz
 
 failed to support a valid Order, an Order of "forced visitation" could be entered once the trial judge has (1) afforded the parties an opportunity for a hearing in accordance with due process, (2) created an Order setting out specific findings of fact and conclusions of law to justify and support the Order, and (3) made findings that include at a minimum that the drastic action of incarceration of a parent is reasonably necessary for the promotion and protection of the best interest and welfare of the child.
 

 Reynolds
 
 ,
 
 109 N.C. App. at 113
 
 ,
 
 426 S.E.2d at 104
 
 (citations omitted) (emphasis added).
 

 The
 
 Reynolds
 
 Court concluded that the order did not violate the plaintiffs' due process rights, since it was "not analogous to the contempt provision in the
 
 Mintz
 
 case as it does not provide that the violator will be incarcerated upon the oral report of a violation to the sheriff. Rather, the provision is a valid declaration that one who violates the Order will be subject to contempt proceedings in accordance with due process."
 
 Reynolds
 
 ,
 
 109 N.C. App. at 113
 
 ,
 
 426 S.E.2d at 105
 
 . The holding of
 
 Reynolds
 
 is simply that custody or visitation provisions do not violate the constitutional due process rights of either the parents or the child
 
 *591
 
 because they are enforceable by contempt proceedings as long as the alleged condemner has proper notice and opportunity for hearing.
 
 See generally
 

 id
 
 .
 
 Reynolds
 
 does not establish any sort of "forced visitation" rule.
 

 Id.
 

 Nor does the
 
 Mintz
 
 case create a "forced visitation" rule as Mother claims.
 
 See generally
 

 64 N.C. App. 338
 
 ,
 
 307 S.E.2d 391
 
 . In fact,
 
 Mintz
 
 uses the word "forced" only once, in the first sentence, as a description of what happened in the case: "This case concerns a domestic confrontation between mother and father over forced visitation of their 11-year-old child with the father."
 
 Id.
 
 at 338,
 
 307 S.E.2d at 392
 
 .
 
 [10]
 
 As noted in
 
 Reynolds
 
 , the
 
 Mintz
 
 order was defective because it allowed immediate incarceration of the alleged contemnor based on the word of the other parent, without opportunity for prior notice and hearing.
 
 Reynolds
 
 ,
 
 109 N.C. App. at 113
 
 ,
 
 426 S.E.2d at 104
 
 .
 
 Mintz
 
 does not address any sort of "implied" provisions of forced visitation.
 
 See generally
 

 Mintz
 
 ,
 
 64 N.C. App. 338
 
 ,
 
 307 S.E.2d 391
 
 .
 

 Mother argues that because the 2015 Modified Custody Order has a provision that "[t]his order is enforceable by the contempt powers of the Court," it is a "forced visitation" order. Father responds that this provision is unnecessary, since
 
 all
 
 custody and visitation orders are enforceable by the contempt powers of the court anyway. Many orders include this provision simply as a reminder to the parties of the potential consequences of violation, but its absence does not mean the order cannot be enforced by contempt under N.C. Gen. Stat. § 5A-11 (2017) ("Criminal contempt") or
 
 *464
 
 N.C. Gen. Stat. § 5A-21 ("Civil contempt"). But Mother argues this provision creates a "forced visitation" order with "express and implied" requirements. Apparently, the "express" requirements are the custodial schedule, and the "implied" requirements are the actions a party must take to "force" visitation or custodial time in accord with the order. She argues that
 

 to avoid contempt, Father must do exceedingly more than meet the
 
 de minimis
 
 threshold the court seemingly (and incorrectly) created here-that is, he cannot forestall a "willful noncompliance" determination merely by foregoing blatant force, manipulation, punishment, marginalization, persuasion, or mandates to thwart Daughter's court-ordered "best interests" relationship with Mother.
 

 *592
 
 This awkward sentence seems to be based in part upon the trial court's finding No. 27:
 

 27. The Court finds that Father did not create any situation to manipulate, or otherwise punish, or marginalize Mother's parenting time, nor did Father attempt to persuade or mandate in any fashion that [Mary] and [John] should not spend time with Mother as set forth in the Modified Custody Order."
 

 But the trial court's finding was simply addressing Mother's own allegations in her Omnibus Motion that Father had intentionally done these very things in the past to alienate the children from her and was continuing to do them still. For example, her Omnibus Motion makes detailed allegations about times when Father had in the past "physically blocked" the children from seeing Mother; used his religion to divide the children from her; "used his 'money, power, and high energy to influence professionals to advance his agenda with respect to' " the children; "manipulated the professionals involved in the care of his children;" empowered the children to make Mother appear to be the "the bad guy," and many other similar allegations. The trial court found that Father had
 
 not
 
 committed this misbehavior as alleged by Mother's Omnibus Motion. This finding does not mean that the trial court misunderstood Father's obligation to take any reasonable measures possible to make Mary return to her Mother's home. Instead, the trial court found that "Father has taken reasonable measures to comply with the order as detailed in Findings of Fact 20, 21, and 22.
 
 [11]
 
 However, any noncompliance with the Modified Custody Order is, again, due to [Mary's] refusal to comply and not due to or caused by any noncompliance with the order by Father."
 

 In every custody case, even contempt cases, the "polar star" is the best interest of the children; the
 
 Mintz
 
 case makes this point:
 

 In all custody or visitation cases the child's best interest is the polar star. Here, the order fails to contain any findings
 
 *593
 
 that the best interests and welfare of the child would be served by jailing the mother if the child refuses to visit with his father. This failing in the order also contributes to its invalidity.
 

 Mintz
 
 ,
 
 64 N.C. App. at 340
 
 ,
 
 307 S.E.2d at 393
 
 (citations omitted). The
 
 Mintz
 
 Court also notes that for older children, the trial court may give more weight to the wishes of the child:
 

 If the child is of the age of discretion, the child's preference on visitation may be considered, but his choice is not absolute or controlling. As to what age is the age of discretion, we feel that the better statement of the law is that found in 42 Am. Jur. 2d
 
 Infants
 
 § 45 (1969) : The nearer the child approaches the age of 14, the greater is the weight which should be given to the child's custodial preference. As to
 
 *465
 
 when the child is mature and intelligent enough to formulate a rational judgment concerning its welfare, it is generally agreed that in the absence of a statute to the contrary, no specific age is set by law in this regard, but the question depends on the mental capacity, or the mental development, or the intelligence of each child in question. It remains the duty of the trial judge to determine the weight to be accorded the child's preference, to find and conclude what is in the best interest of the child, and to decide what promotes the welfare of the child.
 

 Id.
 
 at 340-41,
 
 307 S.E.2d at 393-94
 
 (citations omitted).
 

 Mary was 15 years old at the time of the hearing, and the evidence showed that she is a very intelligent, mature, and capable young woman. The trial court heard Mary's testimony and testimony from her long-time pediatrician and her school guidance counselors. The trial court had the duty to consider the weight to give to her preference and to consider her best interests; the transcript and order show the trial court took this duty seriously. Although this is a contempt case and not a case establishing custody, the trial court was considering Mary's best interests as part of its evaluation of what Father should do to make Mary visit her Mother. There is no dispute that she was depressed and self-harming.
 
 [12]
 

 *594
 
 Dr. Shulstad testified that he had insisted that Mary go to therapy, and if she had not, he would have considered inpatient treatment for her protection.
 
 [13]
 
 The evidence showed, and the trial court determined, that Mary's older brother, John, was the one whom she confided in and he sought help for her. And Mary and John then refused to return to their Mother's home. Mary testified that she was more depressed and anxious at her Mother's home and she did not feel she was ready to return. The trial court determined that Father did all that he could reasonably do to get Mary to visit her mother without resorting to actions that would likely be harmful to her. Mother cites to
 
 Hancock v. Hancock
 
 ,
 
 122 N.C. App. 518
 
 ,
 
 471 S.E.2d 415
 
 (1996), and argues that Father "did not 'do everything possible short of using physical force or a threat of punishment' to ensure [Mary] was in Mother's custody." She notes that Father picked Mary up from school or soccer practice, "indulged" her by allowing her to keep her phone, see friends, go on trips out of town, buy new clothes, "enjoy an amusement park[,]" and "mingle at various other social events." The trial court considered Mary's best interests and determined that Father did all that he could reasonably do without making Mary's situation worse. When announcing the ruling to the parties at the hearing, the trial court noted: "I cannot-and this might be one of the most compelling parts-I cannot find it is in the best interest of [Mary] to force visitation at this time, consistent with
 
 Hancock
 
 , based on what the testimony was from her."
 

 Father was dealing with a depressed teenage girl who was self-harming. He picked her up from school because she told him she would walk home from school or practice instead of going with her mother, if he did not pick her up. Isolating her from friends or locking her in the house would likely exacerbate her condition. Mary was in therapy and improving, but therapy does not have instantaneous results. The trial court was well aware of the parties' "tumultuous history" and Father's past misdeeds-as are we, since Mother has listed them several times all the way back to 2006 in her Omnibus Motion and her brief-but the trial court properly considered Mary's best interests and the
 
 current
 

 *466
 
 circumstances in evaluating whether Father was in willful civil contempt.
 

 C. Willfulness
 

 Mother next contends the trial court "misapprehended" the law regarding willful contempt by a parent in the context of a child's refusal
 
 *595
 
 to visit with or see the other parent. She also argues extensively this Court should disapprove or limit
 
 Hancock
 
 and that the trial court erred by relying on
 
 Hancock
 
 .
 
 [14]
 
 She claims that
 

 the Modified Custody Order clearly contains the type of "forced-visitation" provision that
 
 Mintz
 
 contemplated and
 
 Reynolds
 
 recognized,
 
 see
 

 109 N.C. App. at 113
 
 ,
 
 426 S.E.2d at 104-105
 
 , making
 
 Reynolds
 
 precedential and
 
 Hancock
 
 inapposite.
 
 See
 

 Hancock
 
 ,
 
 122 N.C. App. at 526
 
 ,
 
 471 S.E.2d at 420
 
 (noting the underlying consent judgment and the contempt order lacked the type of forced-visitation provision contemplated in
 
 Mintz
 
 ). The forced-visitation provision's presence here thus vitiates challenged Findings of Fact 23-27, 29-30, 32-36, and Conclusions of Law 1-3 and 5-8, for they all assume its absence.
 

 Mother argues that the 2015 Modified Custody Order has "implied forced visitation" provisions and Father willfully violated those "implied" provisions by not forcing Mary to go to her Mother's home, but the trial court failed to recognize these "implied" requirements of the Order based upon its interpretation of
 
 Hancock
 
 ,
 
 122 N.C. App. 518
 
 ,
 
 471 S.E.2d 415
 
 . Specifically, Mother argues:
 

 Here, the court interpreted
 
 Hancock
 
 and its progeny to rule otherwise, determining that Father could not be held in contempt-even though he never even attempted to use any incentive, reward, punishment, or other effective means of persuasion to ensure compliance-because the Modified Custody Order purportedly lacks an express forced-visitation provision.
 

 Mother's argument misconstrues
 
 Hancock
 
 and
 
 Reynolds
 
 and ignores the requirement that all orders dealing with child custody and visitation, even a contempt order, must consider the best interests of the child.
 

 In
 
 Hancock
 
 , the parties' son refused to go on three weekend visits with his father.
 
 Hancock
 
 ,
 
 122 N.C. App. at 521-22
 
 ,
 
 471 S.E.2d at 417
 
 . The trial court held the mother in civil contempt for willful failure to comply with the visitation order.
 

 Id.
 

 at 522
 
 ,
 
 471 S.E.2d at 417-18
 
 . On appeal, the mother argued that "there must be a showing that the custodial parent deliberately interfered with or frustrated the noncustodial parent's visitation before the custodial parent's actions can be considered willful."
 

 *596
 

 Id.
 

 at 522
 
 ,
 
 471 S.E.2d at 418
 
 . This Court agreed and reversed the order of civil contempt.
 

 Id.
 

 at 523
 
 ,
 
 471 S.E.2d at 418
 
 . The Court noted the testimony by mother, her daughter, and the child; all of the evidence showed that the mother had gotten the son ready for visitation, packed his things, told him he had to go, put him outside for his father to pick him up while she stayed inside, and told him to get into the car with his father.
 

 Id.
 

 at 523-24
 
 ,
 
 471 S.E.2d at 418-19
 
 . He refused.
 
 Id
 
 . at 524,
 
 471 S.E.2d at 419
 
 . The son testified that "he loved his father and wished to spend time with him, but only if his father's second wife and her children would not be there."
 

 Id.
 

 He said he did not "feel comfortable" with his father's wife or at his father's home, that his step-mother "called him 'a spoiled brat,' " and that the bed there was uncomfortable.
 
 Id
 
 . at 525,
 
 471 S.E.2d at 419
 
 . There was evidence he "hated" his step-brother.
 

 Id.
 

 This Court held there was no evidence that the mother had willfully disobeyed the court's order and she was not in civil contempt:
 

 Nowhere in the record do we find evidence that plaintiff acted purposefully and deliberately or with knowledge and stubborn resistance to prevent defendant's visitation with the child. The evidence shows plaintiff prepared the child to go, encouraged him to visit with his father, and told him he had to go. The child simply refused.
 
 Plaintiff did everything possible short of using physical force or a threat of punishment to
 

 *467
 

 make the child go with his father. While perhaps the plaintiff could have used some method to physically force the child to visit his father, even if she improperly did not force the visitation, her actions do not rise to a willful contempt of the consent judgment.
 

 Id.
 

 at 525
 
 ,
 
 471 S.E.2d at 419
 
 (emphasis added).
 

 The
 
 Hancock
 
 Court further noted that the father may have a remedy by asking the trial court for an order of "forced visitation," but civil contempt was not the proper remedy:
 

 Where, as here, the custodial parent does not prevent visitation but takes no action to force visitation when the child refuses to go, the proper method is for the noncustodial parent to ask the court to modify the order to compel visitation. A trial judge has the power to make an order forcing a child to visit the noncustodial parent. In this case, the trial court attempted the functional equivalent of an order of forced visitation by sentencing plaintiff to jail but allowing her to purge herself of contempt by
 
 *597
 
 delivering the child over to defendant each and every time he was entitled to visitation. However, the order fails as an attempt at forced visitation.
 

 Id.
 

 at 526
 
 ,
 
 471 S.E.2d at 420
 
 (citations, quotation marks, and brackets omitted). The
 
 Hancock
 
 Court noted that a trial judge could enter an "order of forced visitation" but only if
 

 the circumstances are so compelling and only after he has done the following: afforded to the parties a hearing in accordance with due process; created a proper court order based on findings of fact and conclusions of law determined by the judge to justify and support the order; and made findings that include at a minimum that the drastic action of incarceration of a parent is reasonably necessary for the promotion and protection of the best interest and welfare of the child. Neither the consent judgment nor the contempt order contains any findings that the incarceration of the plaintiff is reasonably necessary to promote and protect the best interests of the child.
 

 Id.
 

 (citation and quotation marks omitted).
 

 Here, Mother included in her Omnibus Motion two motions which are essentially motions for a forced visitation order. She asked for a mandatory preliminary injunction requiring Father to return Mary to her home and to "exert his parental influence" to make her stay there. She also asked for "judicial assistance" in the form of mandated reunification therapy. If these motions are not requests for "forced visitation" orders, it is hard to imagine what a forced visitation request would include. Those motions are not subjects of the order on appeal. But even in a contempt order, if the trial court is to enter a contempt order that operates as an order of "forced visitation," the order may be entered only under "compelling" circumstances and
 

 only after he has done the following: afforded to the parties a hearing in accordance with due process; created a proper court order based on findings of fact and conclusions of law determined by the judge to justify and support the order; and made findings that include at a minimum that the drastic action of incarceration of a parent is reasonably necessary for the promotion and protection of the best interest and welfare of the child.
 

 Id.
 

 (quoting
 
 Mintz
 
 ,
 
 64 N.C. App. at 341
 
 ,
 
 307 S.E.2d at
 
 394 ). And this is exactly what the trial court noted it could
 
 not
 
 do: "this might be one of
 
 *598
 
 the most compelling parts-I cannot find that it is in the best interest of [Mary] to force visitation at this time."
 

 Mother seeks to distinguish
 
 Hancock
 
 based upon the differences in the facts: the duration of the missed custodial time; the custodial status (denial of weekend visitation v. physical custody); Father's "indulgence" of Mary when at his home; and the tumultuous history of this case. We agree that no two custody cases are alike factually; "Happy families are all alike; every unhappy family is unhappy in its own way."
 
 [15]
 
 The trial court's job is to hear the evidence, find the facts, consider those facts and circumstances, and determine what action the parent should reasonably
 
 *468
 
 take to force visitation, consistent with the best interests of the child.
 
 See generally
 

 Hancock
 
 ,
 
 122 N.C. App. at 526
 
 ,
 
 471 S.E.2d at 420
 
 . The differences in the facts of the cases do not eliminate
 
 Hancock
 
 as a precedent supporting the trial court's order, nor is it the only case which supports the order.
 
 See also
 

 McKinney v. McKinney
 
 , --- N.C. App. ----, ----,
 
 799 S.E.2d 280
 
 , 284-85 (2017) ("In the present case, the district court made no finding that Father refused to allow Max to live with Mother or refused to obey the custody orders. The district court did not find that Father encouraged Max to stay with him, but rather, found that he told Max that Max should go home. It is true that the district court found that Father did not punish Max or make life uncomfortable for Max while remaining in Wilmington. And these actions and inactions may have been improper, but otherwise do not rise to the level of contempt. We do not think that the findings that Father provided a high standard of living for Max which was an 'enticement' for Max to prefer living with Father is enough to rise to the level of willfulness, absent a finding supported by the evidence that Father provided a high standard of living for the purpose of enticing Max to run away from Mother rather than merely for the purpose of providing for or bonding with Max." (citations omitted) ).
 

 The need to consider the child's best interest is why cases have typically not required a parent to use "physical force" or other extreme measures to make a child visit or stay with a parent.
 
 See generally
 

 McKinney
 
 , --- N.C. App. at ----,
 
 799 S.E.2d at
 
 284-85 ;
 
 Hancock
 
 ,
 
 122 N.C. App. at 525-26
 
 ,
 
 471 S.E.2d at 419-20
 
 . A certain amount of physical force would make a child go in any case, regardless of the child's age or circumstances, but it would probably never be in a child's best interest.
 

 Mother's predictions of anarchy in enforcement of custody orders based upon
 
 Hancock
 
 -and the trial court's order-from allowing a
 
 *599
 
 parent to ignore a court order with impunity where a child simply refuses to go are unfounded. She argues:
 

 Granting an alleged contemnor absolution based [sic]
 
 Hancock
 
 , however, violates several fundamental legal principles and perpetuates bad public policy.
 

 For instance, allowing a parent to sidestep contempt based on a child's actual or purported refusal to honor a custody order-i.e., the adjudication of what is in the child's best interest-effectively means that a child possesses actual or apparent authority to modify or otherwise override the ruling,
 
 sua sponte
 
 . This is wrong on several levels. This faulty position likewise seemingly implies that every court-ordered custody/visitation schedule automatically is subject to a child's approval, a condition previously allowed only by express provision under extreme circumstances.
 

 Further, allowing a parent to raise a child's actual or purported "wishes" as a shield against contempt liability in such circumstances perversely places the child in jeopardy of being (1) held in contempt; and/or (2) adjudicated "delinquent" or "undisciplined". It similarly exposes the alleged contemnor-parent to possible criminal prosecution for aiding a "delinquent" or "undisciplined" juvenile.
 

 (Citations omitted).
 

 The order on appeal did not allow Father to ignore the court's order with impunity. And neither
 
 Hancock
 
 nor any other case grants alleged contemnors "absolution" based simply on a child's refusal or wishes, nor does it imply that any "court-ordered custody/visitation schedule" is subject to a child's approval. The problem with Mother's efforts to hold Father in civil contempt was not the provisions of the Order or
 
 Hancock
 
 ; it was the unique facts of this case, including Mary's mental health concerns. This is not a case of a young child simply saying "no."
 

 III. Conclusion
 

 The trial court did not misapprehend the law of civil contempt, either on the burden of proof or willfulness. The trial court's conclusions of law are supported by the findings of fact. We therefore affirm the order.
 

 AFFIRMED.
 

 Chief Judge McGEE and Judge BRYANT concur.
 

 [1]
 

 We use pseudonyms to protect the identity of the parties' children.
 

 [2]
 

 Mother's counsel described the history in his closing argument, stating that he first wanted to "remind the Court ... that [Father] has created nine years of litigation, has filed three motions to modify custody, has participated in two three-week custody trials, has involved the children with subpoenas, affidavits, live testimony last time and this time. There have been four judges, 636 findings of fact in two custody orders." And now, we can add two appeals to this tally.
 

 [3]
 

 John had attained the age of 18 years old two months before Mother filed the Omnibus Motion, but he was still a minor as of January 2016 and at the time of most of the events described in the motion. Thus, when we refer to the "children," we are referring to both John and Mary, but we realize that John was an adult when the Omnibus Motion was filed and he was no longer subject to the 2015 Modified Custody Order at that time.
 

 [4]
 

 The trial court has entered orders addressing the other motions in the Omnibus Motion and those orders are not the subject of this appeal.
 

 [5]
 

 Mother has not suggested any impropriety by the trial court and we cannot discern any conceivable legal basis for her request for a "new fact-finder." Mother asks for remand and she asks not only for another bite at the apple-she wants a new apple also.
 

 [6]
 

 The trial court agreed, and we agree that
 
 everyone
 
 should be complying with the existing 2015 Modified Custody order, but the reality is this: as of 27 May 2019, Mother and Mary will have to deal with their relationship on their own terms. We sincerely hope they will be successful, and sooner rather than later.
 

 [7]
 

 Despite its length, this opinion does not fully reflect the procedural or factual complexities of this case. After all, Mother calls her motion an "Omnibus Motion", and this name is accurate; Omnibus means, according to Black's Law Dictionary, "In all things; on all points."
 
 In omnibus
 
 , Black's Law Dictionary (10th Ed. 2014).
 

 [8]
 

 The trial court demonstrated its understanding of the burden of proof at this point in the hearing as well. When the trial court asked if Mother would call any witnesses, her counsel stated, "I don't have a witness." The trial court responded, "Nor are you required to do so with a show cause."
 

 [9]
 

 Although she fortunately did not request this relief before the trial court, Mother implies quite strongly that the trial court could even hold
 
 Mary
 
 in contempt for not returning to her physical custody. She notes that "the court here incorrectly omitted Daughter as a person (1) to whom the Modified Custody Order is directed; and (2) over whom it possesses jurisdiction."
 

 [10]
 

 Mintz
 
 does use the verb "force" three times, but these are as part of the facts and description of the issues. For example, the mother claimed "she felt she could not force David to go with his dad."
 
 Id.
 
 at 338-39,
 
 307 S.E.2d at 392
 
 (quotation marks omitted).
 

 [11]
 

 Those findings state that Father encouraged Mary to return; he drove Mary by her Mother's house and encouraged her to get out and visit Mother; he invited Mother to come to his home to talk to Mary. Although the trial court did not specifically find how many times these things happened, these are ultimate findings of fact.
 
 See, e.g.,
 

 In re Harton
 
 ,
 
 156 N.C. App. 655
 
 , 660,
 
 577 S.E.2d 334
 
 , 337 (2003) ("The trial court may not simply recite allegations, but must through processes of logical reasoning from the evidentiary facts find the ultimate facts essential to support the conclusions of law." (Citation and quotation marks omitted) ). The trial court need not recite all of the evidence, but the evidence showed Father encouraged Mary to return and drove her to her Mother's home almost daily except during times when they were out of town.
 

 [12]
 

 Mother actually took the position at the hearing that Mary's self-harming was "irrelevant" to whether Father was in contempt. In a colloquy regarding one of the many objections during John's testimony, her counsel stated: "We'll stipulate there was cutting going on. I question what the relevance is of all of this in determining whether or not [Father] has wilfully violated the Court's order by not allowing [Mother] the right to exercise her custody time. There is no relevance."
 

 [13]
 

 He testified, "When you are self cutting, [Mary] or any other self-cutter who refuses therapy, yes. Then the appropriate medical decision is that child is doing harm to themselves and at any point could go beyond self-cutting to self-mutilation to accidental death, that child needs to be admitted to the hospital."
 

 [14]
 

 Mother filed a Motion for Initial
 
 En Banc
 
 review in this case, requesting this Court to overrule
 
 Hancock
 
 explicitly. The motion was denied.
 

 [15]
 

 Leo Tolstoy,
 
 Anna Karenina
 
 3 (Melanie Hill & Kathryn Knight eds., Constance Garnett trans., 2005) (1875).